**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 24-4029**

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

CEDRIC LEE BENTON,

Defendant – Appellant.

**No. 24-4030**

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

CEDRIC LEE BENTON,

Defendant – Appellant.

Appeals from the United States District Court for the Western District of North Carolina, at Charlotte.  Robert J. Conrad, Jr., District Judge.  (3:22−cr−00253−RJC−DCK−3; 3:05−cr−00105−RJC−2)

Argued:  March 18, 2025                    Decided:  August 18, 2025

Before DIAZ, Chief Judge, and WYNN and BENJAMIN, Circuit Judges.

_____

Affirmed by unpublished opinion.  Chief Judge Diaz wrote the opinion, in which Judge Wynn and Judge Benjamin joined.

_____

**ARGUED:**  Ann Loraine Hester, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charlotte, North Carolina, for Appellant.  Julia Kay Wood, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.  **ON BRIEF:**  John G. Baker, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charlotte, North Carolina, for Appellant.  Dena J. King, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Chief Judge:

Cedric Lee Benton challenges the consecutive sentences the district court imposed for his wire fraud offenses and supervised release violations. Benton argues that the district court procedurally erred by failing to address his mitigating arguments in support of lower sentences.

But even if the district court committed procedural error, we conclude that such errors were harmless. We thus affirm.

## I.

### A.

In 2007, after Benton pleaded guilty to conspiracy to possess cocaine with intent to distribute, the district court sentenced him to 262 months' imprisonment and 10 years' supervised release. At the time, Benton had twenty-one criminal convictions that began in 1996; his state probation had been revoked once; he was on state probation for passing counterfeit bills; and he'd been out of prison on state drug charges for fewer than two years when he committed the federal drug conspiracy offense.

While in prison on the drug conspiracy charge, officials cited him for fourteen infractions. Those infractions included (among others) using drugs and alcohol, refusing to obey an order, and indecent exposure.

3

In 2021, the district court applied the First Step Act[1] to reduce Benton's sentence to time served—208 months' imprisonment—and 4 years of supervised release.

About three months after his release, Benton—with the help of several co-conspirators—submitted two fraudulent loan applications under the Paycheck Protection Program ("PPP"), a federal program intended to support small businesses during the COVID-19 pandemic.

In the applications, Benton certified that he operated a trucking business in 2019—when he was, in fact, incarcerated—and that he would use the loan proceeds to retain (nonexistent) employees. As part of the scheme, Benton submitted false tax forms. Benton received loans totaling $41,666, which he used for personal expenses.

Several months later, Benton's probation officer saw Benton pour liquid from a plastic bag into his urine collection cup during a mandatory drug screening.

Because of the fraudulent loan application and suspected drug testing violations, the probation office recommended that the district court revoke Benton's supervised release. The probation office ultimately calculated a guidelines range of 33 to 36 months' imprisonment for the loan fraud offense.

A federal grand jury then indicted Benton and two co-conspirators on fraud charges related to the PPP loan applications. Benton pleaded guilty to three charges—one for wire-fraud conspiracy and two for wire fraud—without a plea agreement.

---

[1] Pub. L. No. 115-391, § 404(b), 132 Stat. 5194, 5222 (2018).

B.

1.

The probation office prepared a presentence report for the three fraud convictions. The report calculated a base offense level of seven. The report then added six levels based on a loss amount over $40,000 but subtracted two levels for Benton's acceptance of responsibility, for a total offense level of eleven.

The report assigned Benton a criminal history category of II, which had dropped substantially since his last conviction. Many of his prior convictions had taken place too long ago to add criminal history points now, even though Benton was incarcerated on the federal drug conspiracy charge when the convictions had "aged out."

Finally, the report mentioned that Benton committed multiple infractions while incarcerated and on supervised release, that he had a ten-month-old daughter, and that he had received substance abuse treatment in the past that he wanted to continue through the Bureau of Prisons.

2.

The district court held a joint sentencing and revocation hearing, and began with the fraud offenses.

The parties agreed that the guidelines ranged from ten to sixteen months' imprisonment. Benton requested a low-end ten-month term. He argued that he "was a very small part of a much larger scheme," and that he "wouldn't even have known how to fill out the forms, what to do with the forms, [or] where to file [them]." J.A. 59–60. Rather, he insisted that his co-conspirators led the charge in executing the fraudulent scheme.

5

Benton also contended that a longer sentence could result in a potential sentencing disparity with an unindicted co-conspirator in the loan fraud scheme who received a 44-month revocation sentence. The co-conspirator (who was sentenced by a different district judge) received a sentence that was seven months below his guidelines range.

Benton urged that a low-end sentence on the fraud charges was appropriate because he was "looking at so much time on the supervised release violation," which had a guidelines range of "three times as much" as the fraud charges. J.A. 63. And he highlighted that he had a young child who he "want[ed] to get back to" and "want[ed] to be able to provide for." J.A. 64.

The district court dismissed Benton's concern about the sentencing disparity, explaining that criminal history wasn't "a real helpful area for Mr. Benton" because his criminal history was so lengthy. J.A. 60. The court expressed frustration that fifteen of the convictions that received criminal history points when Benton was sentenced for the drug conspiracy charge no longer counted toward his criminal history. "It appears," said the district court, "that this advisory range is grossly inadequate to reflect the actual criminal conduct over time." J.A. 62.

Benton's arguments to the contrary didn't move the district court. The court noted that Benton "alleg[ed] to the federal government, to steal money from the PPP program, that he was running a business," even though he had been incarcerated at the time. J.A. 63. The district court added that the loan program was "put in place to aid people suffering during a pandemic" and that Benton "robbed" the program by "claiming to be running a trucking business while actually being imprisoned on a drug-trafficking conviction."

6

J.A. 68. Not mincing words, the court commented that "there may be worse crimes in the world, but that's a pretty heinous crime." J.A. 68.

The government requested a total sentence of forty-eight months—fourteen months on the fraud charges and thirty-four months on the supervised release violation. The government argued that the fourteen-month sentence wouldn't create a sentencing disparity because comparing the co-conspirator's supervised release sentence to Benton's fraud sentence was comparing "apples and oranges." J.A. 66. The government also noted Benton's "abysmal" conduct while imprisoned. J.A. 67.

The district court sentenced Benton to thirty-two months on the fraud charges after "consider[ing] the information in the presentence report," "consult[ing] the advisory guidelines," "hear[ing] the arguments of the attorneys," and "read[ing] the letter of support" filed on Benton's behalf. J.A. 68. The court also considered the "extremely serious" nature of the PPP fraud. J.A. 68. It remarked that "though Mr. Benton was only one player in a multi-conspiracy crime, stealing $40,000 from a [g]overnment fund designed to help people suffering from a pandemic, claiming to be a business owner when, in fact, serving a lengthy drug-trafficking conviction" was, to the court, "fraud upon fraud in a way that just mocks the law, doesn't respect it." J.A. 68–69.

The district court next explained that Benton's "criminal history [was] just staggering," "go[ing] back to the early '90s" with "very serious offenses." J.A. 69. The court again reviewed the multiple "zero-point convictions," which left "the current treatment" of Benton's criminal history "just a joke." J.A. 69. That treatment "[didn't] meet any [§] 3553(a) purposes at all," in part because Benton was "someone who shows

7

no signs of being rehabilitated, even though he got the benefits of the First Step Act[] [and] got the benefit of criminal history points disappearing just because time moves on while he's in prison, not because there's a cessation of criminal activity." J.A. 69–70.

The court found that "the criminal history category [of II] [didn't] in any way, shape, or form reflect[] the seriousness of Mr. Benton's criminal history." J.A. 70. Likewise, opined the district court, "[i]t doesn't do anything to protect the public from further crimes of Mr. Benton that are like the criminal conduct in the instant case." J.A. 70.

The district court didn't think either Benton's recommended sentence of ten months' imprisonment or the government's request of fourteen months' imprisonment "[came] anywhere close to accomplishing the [§] 3553(a) factors applicable in this case." J.A. 70.

The court then addressed the sentencing disparity between Benton and his unindicted co-conspirator, saying that it didn't "think there [was] any comparison between the criminal history of Mr. Benton" and the co-conspirator. J.A. 70–71. With Benton's criminal history, the court found that it had "a duty . . . to protect the public from someone who shows such disrespect for the law as this case reflects." J.A. 71.

The § 3553(a) factors thus "compel[led] [the court] to sentence above the guideline range." J.A. 71. The district court "var[ied] to a criminal history category [of VI]" and imposed a sentence of thirty-two months on each of the three fraud counts to be served concurrently. J.A. 71.

Even that sentence, said the court, didn't "adequately protect[] the public from this kind of criminal recidivism, but it result[ed] in a sentence that is twice the upper end of the guideline range with a logical explanation for doing it." J.A. 71. In pronouncing its

8

sentence, the district court recommended that Benton be allowed to participate in substance-abuse programs. And the court "call[ed] to the attention of the custodial authorities that he has a history of mental-health issues," so it also recommended that "he be allowed to participate in any available mental-health programs." J.A. 72.

### 3.

The district court then turned to Benton's revocation sentence.

Benton requested a twenty-six-month sentence to run concurrently with his fraud sentence. He noted once more the possibility of a sentencing disparity with the unindicted co-conspirator and explained that a twenty-six-month sentence would account for the fact that his co-conspirator received a revocation sentence that was seven months below his guideline range.

Benton next explained that his father died while he was in custody and he had to attend his father's funeral over Zoom, "which was traumatic." J.A. 77. Similarly, Benton explained that his mother was "70 years old" and "in hospice care." J.A. 77. Benton's "biggest fear" was that she was "going to die while he[] [was] in prison" and that he'd "have to possibly attend her funeral over Zoom." J.A. 77. Lastly, Benton pointed out that he had "a drug problem he need[ed] treatment for." J.A. 78.

The government, meanwhile, requested "a guideline sentence of 34 months." J.A. 78. The government recounted that "the [c]ourt[] [had] already gone over the prior history of this defendant" during the fraud sentencing, including "his behavior while in custody." J.A. 78. But the government noted that Benton's second supervised release violation wasn't "in any way applicable" to Benton's co-conspirator's, given Benton's

9

"contemptuous" and "devious" falsification of his drug tests. J.A. 78–79. Before concluding, the government identified the guidelines range as thirty-three to forty-one months but explained that "because of the statutory provisions, [the range is] limited to [thirty-six] months and [is], in fact, capped." J.A. 79.

The court first observed that Benton's violations "constitute[d] a breach of trust with the probation office" and "show[ed] utter contempt" for the original district judge's supervised release order. J.A. 80. The court continued that "the fraud conspiracy in violation of law, and the submission of false urine samples shows an attitude towards the law that requires the [c]ourt's sentence to deter and to protect among the other [§] 3553(a) factors."[2] J.A. 80. So, "to meet that breach of trust" and "to accomplish the [§] 3553(a) factors," the court imposed a within-guidelines sentence of thirty-four months' imprisonment, to be served consecutive to the fraud sentence. J.A. 80.

This appeal followed.

---

[2] The Supreme Court recently held in *Esteras v. United States*, 145 S. Ct. 2031 (2025), that district courts may not "account for the need to exact retribution for the defendant's underlying crime" under § 3553(a)(2)(A) when deciding whether to revoke a term of supervised release. *Id.* at 2040. Instead, only the "*forward-looking*" factors enumerated in § 3583(e) are permissible. *Id.* at 2041; *see id.* at 2045.

Benton hasn't alleged that the district court impermissibly considered § 3553(a)(2)(A) at his revocation hearing. In any event, the district court didn't violate *Esteras*. The court revoked Benton's supervised release to "meet [his] breach of trust" while on supervised release and to "deter and to . . . protect" as outlined by the other § 3553(a) factors made applicable to supervised release violations through § 3583(e). J.A. 80. In short, the court's determination comports with what *Esteras* expressly outlines as permissible—the "*forward-looking* ends of sentencing" rather than the "*backward-looking* purpose of retribution." 145 S. Ct. at 2041.

II.

Benton argues that the district court procedurally erred in imposing both the fraud and revocation sentences. "We review a district court's sentence for abuse of discretion." *United States v. Webb*, 965 F.3d 262, 270 (4th Cir. 2020).

Benton contends that his fraud sentence is procedurally unreasonable because the district court failed to address his nonfrivolous mitigating arguments for a low-end sentence of ten months. Benton claims that the district court didn't address his arguments that (1) "he was a low-level participant in the conspiracy," Appellant's Br. at 14, and (2) he had an infant child for whom he wanted to provide, *id.* at 15.

Benton also asserts that his revocation sentence is plainly procedurally unreasonable because the district court ignored his nonfrivolous mitigating arguments and failed to consider the applicable guidelines range. There, Benton claims that the district court didn't address his arguments that (1) he should get "the same 'seven months off'" as his unindicted co-conspirator, *id.* at 19, (2) he "was unable to attend his father's funeral in person and that [his] mother [was] 70 years old," *id.* at 21, and (3) he had a drug problem, *id.*

Because both sets of alleged errors are harmless, we address them together.

A.

When reviewing a sentence for procedural reasonableness, we consider—among other requirements—whether the district court has "place[d] on the record an individualized assessment based on the particularized facts of the case before it." *Webb*, 965 F.3d at 270 (cleaned up). "[A] district court must address or consider all non-frivolous

11

reasons presented for imposing a different sentence and explain why it has rejected those arguments." *Id.* (cleaned up).

But a procedural error doesn't automatically compel reversal. Rather, such errors are subject to harmless error review. *See United States v. Lynn*, 592 F.3d 572, 576 (4th Cir. 2010). To show harmlessness in this context, the government must prove "with fair assurance that the district court's explicit consideration of the defendant's [mitigating] arguments would not have affected the sentence imposed." *United States v. Boulware*, 604 F.3d 832, 838–39 (4th Cir. 2010) (cleaned up). In other words, a procedural error is harmless only when the government establishes that "the error did not have a substantial or injurious effect or influence the result." *United States v. Ross*, 912 F.3d 740, 745 (4th Cir. 2019) (quotation omitted).

A reviewing court may find an error harmless where the defendant's non-frivolous arguments are weak—either in fact or in presentation—when compared to the district court's reasons for imposing its chosen sentence. *See Boulware*, 604 F.3d at 839–40. In this context, a weak mitigating argument may "not [be] particularly compelling when juxtaposed with [a defendant's] lengthy criminal history and the circumstances surrounding the instant offense." *United States v. Bourque*, No. 21-4481, 2023 WL 2158367, at *2 (4th Cir. Feb. 22, 2023) (per curiam).

B.

Here, we assume without deciding that the district court erred in failing to explicitly address Benton's mitigating arguments for his fraud and revocation sentences.[3] But we find any assumed error harmless because we can say with "fair assurance" on this record "that the district court's explicit consideration of [Benton's] arguments would not have affected the sentence imposed." *Boulware*, 604 F.3d at 838 (cleaned up).

The district court grounded Benton's fraud sentence in the required § 3553(a) factors and, in doing so, explained why a lower sentence would fall short of accomplishing those statutory goals. The court zeroed in on the "extremely serious" nature of Benton's fraud offense. J.A. 68. Although the court acknowledged that Benton "was only one player in a multi-conspiracy crime," it was troubled that Benton would steal "from a [g]overnment fund designed to help people suffering from a pandemic" and "claim[] to be a business owner when, in fact, [he was] serving a lengthy drug-trafficking conviction." J.A. 68–69. This "fraud upon fraud," said the court, "just mocks the law." J.A. 69.

The district court likewise focused on what was, in its view, Benton's "underrepresented," J.A. 61, yet "staggering," J.A. 69, criminal history. It remarked that "the current treatment" of Benton's criminal history was "just a joke," and didn't "meet any [§] 3553(a) purposes at all." J.A. 69. Benton, according to the district court, was

---

[3] The government argues that the district court didn't procedurally err in imposing either of Benton's sentences because it addressed the "central thesis" of his mitigating arguments. Appellee's Br. at 22. But because we find any alleged error was harmless, we don't reach the government's argument.

"someone who show[ed] no sign of being rehabilitated" despite receiving "the benefits of the First Step Act," so his assigned criminal history category didn't "in any way, shape, or form reflect[] the seriousness of [his] criminal history." J.A. 69–70.

The court believed it had a "duty . . . to protect the public from someone who show[ed] such disrespect for the law," so the § 3553(a) factors "compel[led] it to sentence [Benton] above the guidelines range" on the fraud offense. J.A. 71. But even that sentence (said the court) didn't "adequately protect[] the public from this kind of criminal recidivism." J.A. 71.

Similarly, the district court observed that Benton's supervised release violations "show[ed] an attitude towards the law that require[d] the [c]ourt's sentence to deter and to protect among the other [§] 3553(a) factors." J.A. 80; *see supra* note 1. The court thus imposed a consecutive within-guidelines sentence "to meet that breach of trust" and "accomplish the [§] 3553(a) factors." J.A. 80.

We draw several conclusions from this record.

First, we have "no doubt that the district court considered [Benton's] [mitigating] argument[s] in the context of applying the § 3553(a) factors," even if the court didn't explain why it rejected each of those arguments. *Boulware*, 604 F.3d at 839.

For the fraud sentence, the court "considered the information in the presentence report" and the "arguments of the attorneys," which addressed Benton's criminal history, lesser participation in the fraud scheme, the relevant guidelines ranges, and the fact that Benton had a young child. J.A. 68. The district court also reviewed the letter of support filed on Benton's behalf.

14

As for Benton's revocation sentence, the presentence report addressed Benton's substance-abuse problems and his request for "further treatment through the Bureau of Prisons," J.A. 67, and the district court separately confirmed that it had "consulted the advisory guidelines,"[4] J.A. 68. The court also discussed but dismissed (in the fraud context) concerns about any potential sentencing disparities with Benton's co-conspirators[5] and tailored Benton's sentence to provide substance-abuse treatment.

Second, Benton's mitigating arguments were "relatively weak . . . when balanced against the district court's explanation for the sentence imposed." *United States v. Barefield*, 714 F. App'x 237, 239 (4th Cir. 2017) (per curiam); *see also Boulware*, 604 F.3d at 839–40. That Benton had a young child, for example, didn't undercut the district court's focus on Benton's long criminal history and troubling criminal conduct, particularly where Benton offered no evidence of what care he'd been providing the child, or the care that would be provided in his absence. *See Boulware*, 604 F.3d at 840 (finding assumed procedural error harmless where defendant didn't offer evidence that "in her absence there would be no one else available to support her children . . . or care for her mother").

---

[4] The district court didn't repeat in the revocation portion of the hearing that it had reviewed the presentence report before rendering Benton's sentence. But we're satisfied that the court did so because it heard arguments on both the fraud and revocation sentences in a combined hearing. *See Chavez-Meza v. United States*, 585 U.S. 109, 118–19 (2018).

[5] The district court likewise didn't repeat in the revocation portion of the hearing that it was rejecting Benton's sentencing-disparity argument. But again, because the hearings were combined, we're satisfied that the district court at least heard and considered that argument for the revocation sentence. *See Chavez-Meza*, 585 U.S. at 118–19.

15

The same is true for Benton's mitigating arguments for his revocation sentence. *See id.* The arguments he made in passing about his other family circumstances surely did little to sway the district court when measured against its focus on the permissible sentencing factors. And Benton's remaining arguments—that he was less involved in the fraud, that his co-conspirator received a lesser sentence, and that he suffered from substance-abuse problems—are too weak to tip the statutory scale.

What's more, the district court's comment that it didn't find even the upwardly-varied fraud sentence sufficient to "adequately protect[] the public" from Benton's "criminal recidivism" undercuts whatever limited force his mitigating arguments wielded. J.A. 71. The district court, in its own words, imposed its sentence "with a logical explanation for doing [so]," given the sentencing factors and the parties' arguments. J.A. 71. Terse, to be sure, but adequate (or, at the very least, harmless).

\* \* \*

For these reasons, we affirm the district court's judgment.

*AFFIRMED*

16